U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2017 MAR -8  PM 1:46

CLERK

BY_____
DEPUTY CLERK

JEFFREY ROY SANBORN,               )
                                    )
        Plaintiff,                 )
                                    )
    v.                             )      Case No. 2:16-cv-132
                                    )
NANCY A. BERRYHILL,                )
Acting Commissioner of Social Security,  )
                                    )
        Defendant.                 )

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR AN ORDER REVERSING THE COMMISSIONER'S DECISION AND GRANTING THE COMMISSIONER'S MOTION TO AFFIRM
(Docs. 5 & 6)

Plaintiff Jeffrey Roy Sanborn is a claimant for Social Security Disability Insurance

("SSDI") and Supplemental Security Income ("SSI") benefits under the Social Security

Act. He brings this action pursuant to 42 U.S.C. § 405(g) to reverse the decision of the

Social Security Commissioner that he is not disabled.[1] On October 4, 2016, Plaintiff

filed his motion to reverse (Doc. 5). On December 2, 2016, the Commissioner moved to

affirm (Doc. 6), whereupon the court took the pending motions under advisement.

Plaintiff identifies the following errors in the Commissioner's decision: (1) the

Administrative Law Judge ("ALJ") improperly evaluated the medical evidence by

disregarding Plaintiff's medical records created prior to November 28, 2012 and failing

to identify fibromyalgia as a severe impairment; (2) the ALJ misapplied the treating

---

[1] Disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant's "physical or mental impairment or impairments" must be "of such severity" that the claimant is not only unable to do any previous work but cannot, considering the claimant's age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

physician rule in evaluating the opinions of Karen Huyck, M.D.; (3) the ALJ improperly accorded no weight to Plaintiff's Functional Capacity Evaluation ("FCE"); (4) the ALJ erred in according significant weight to the opinions of Carl Runge, M.D.; and (5) substantial evidence did not support the ALJ's finding that Plaintiff's objective clinical presentation was "consistently quite mild."

James Torrisi, Esq. represents Plaintiff.  Special Assistant United States Attorney Benil Abraham represents the Commissioner.

## I.    Procedural History.

Plaintiff applied for SSDI and SSI benefits on March 13 and March 21, 2014, respectively, alleging a disability onset date of November 27, 2013, which he later amended to November 28, 2013.  The Commissioner denied Plaintiff's claims initially, and upon reconsideration.  Plaintiff thereafter filed a timely request for a hearing before an ALJ.

At a September 16, 2015 video conference hearing before ALJ Thomas Merrill, Plaintiff appeared with Attorney Torrisi, and testified.  Vocational expert ("VE") Christine Spaulding also testified.  In a decision dated October 29, 2015, ALJ Merrill found that Plaintiff did not establish that he was disabled within the meaning of the Social Security Act.  Plaintiff filed a timely appeal on December 21, 2015, which the Appeals Council denied on March 25, 2016.  As a result, ALJ Merrill's decision stands as the Commissioner's final decision.

## II.   Factual Background.

Plaintiff is a right-handed male with a high school education who was born in 1962.  He lives alone and worked as a satellite dish installer from April 2002 to December 2010, and as a real estate sales agent from March 2013 to November 2013.  During the latter time period, his annual gross income was approximately $21,000 but he did not make a profit due to start-up costs and other expenses he incurred.  Plaintiff last worked on November 28, 2013.

### A.    Plaintiff's Medical History.

In January 2010, Plaintiff sustained injuries following a fall at work and underwent surgery in July 2010 to repair a "massive" left rotator cuff tear. (AR 402.) He thereafter complained of persistent neck pain, and began receiving treatment from several medical providers at Dartmouth-Hitchcock Medical Center ("Dartmouth-Hitchcock"), including cervical medial branch blocks. On October 28, 2010, Dr. Huyck, an occupational medicine specialist, recorded that Plaintiff's neck pain "seems most consistent with a whiplash-type injury with cervical and posterior shoulder muscle spasm and likely cervical facet-mediated pain." (AR 400.) She noted that the medial branch blocks had not proven effective. On November 15, 2010, Dr. Huyck prescribed Vicodin and referred Plaintiff to the Dartmouth-Hitchcock Pain Clinic for a comprehensive pain medicine evaluation.

On November 17, 2010, Gilbert Fanciullo, M.D., a pain specialist at Dartmouth-Hitchcock, treated Plaintiff. Dr. Fanciullo recorded a "[c]ervical soft tissue injury" and that there was "some evidence of a C6 radiculopathy, but his symptoms are really in a C7 or C8 distribution and not C6, so I am not sure [i]f this has relevance." (AR 405.) Dr. Fanciullo opined that Plaintiff was a candidate for cervical epidural steroid injection, and should continue with physical therapy. Dr. Fanciullo noted that he would "treat [Plaintiff's] depression first and [Plaintiff] should continue to try to be as active as possible. He needs somehow to get motivated to do more around the house than sitting around, and hopefully his physical therapist will be able to help him accomplish this." *Id.*

In June 2011, Plaintiff underwent an MRI on his left shoulder, which revealed "a recurrent full-thickness rotator cuff tear." (AR 361.) Dr. Huyck recorded on January 24, 2012 that Plaintiff was deciding whether to undergo revision surgery, and had "no changes in symptoms other than more neck pain with cold weather." (AR 366.) On June 20, 2012, Dr. Huyck documented that Plaintiff "has constant, non radiating neck pain, left shoulder pain, left wrist and elbow pain, paresthesias in the ulnar digits bilaterally. He has some right shoulder pain now as well. He is using Elavil and Vicodin. Sleep has not been good lately because of pain." (AR 371.)

3

Beginning in February 2014, Plaintiff received medical treatment and therapy at North Country Hospital. A lumbosacral spine MRI performed on March 6, 2014 indicated "mild broad-based disk protrusion at L5-S1 level of no consequence as the thecal sac is quite diminutive at this level" and was "[o]therwise unremarkable." (AR 454.) An x-ray of Plaintiff's right hip and pelvis revealed no acute bony abnormality but some calcification.

Plaintiff visited Rizwan Haq, M.D. at North Country Hospital on June 10, 2014, complaining of intermittent lower back and right hip pain that radiated to his lower extremity. Dr. Haq opined that Plaintiff was awake and alert, answered his questions appropriately, and that his sensation, coordination, gait and stance appeared normal. Plaintiff exhibited full strength in his upper and lower extremities. Dr. Haq noted that Plaintiff exhibited normal motor functions and that his cranial nerves were normal, but that Plaintiff had "mild tenderness in the midline lumbar region but not on the sides." (AR 479.) Dr. Haq reviewed the lumbar MRI scan and opined that it showed "mild broad based disk bulging at L5-S1 level which is not leading to significant foraminal and spinal stenosis" and "[m]ild disk bulging . . . at L4-L5 level which is also not leading to foraminal and spinal stenosis." *Id.* An electrodiagnostic study showed severe polyneuropathy. Dr. Haq raised the possibility of "diabetic polyneuropathy," but noted that Plaintiff "denies numbness and tingling or pain in his feet other than notices some swelling in the ball of the feet. It is possible that he might be perceiving the numbness as swelling. His diabetes is not well controlled." (AR 480.) Dr. Haq advised Plaintiff to "aggressively control" his diabetes. *Id.*

In the fall of 2014, Plaintiff visited Sreenija Suryadevara, M.D., an endocrinologist at Dartmouth-Hitchcock, for treatment of his type 2 diabetes mellitus. Dr. Suryadevara recorded Plaintiff suffered from "significant neuropathic and non neuropathic pain" (AR 556) and "since [Plaintiff's] pain is significantly limiting his day to day activities," she referred him to Janice Gellis, M.D. of the Dartmouth-Hitchcock Pain Clinic. Dr. Gellis noted on December 8, 2014 that Plaintiff had "5/5" muscle strength in his back, ankles and hips and could both toe walk and heel walk. (AR 568-69.) Dr. Gellis assessed that

4

Plaintiff had "[l]umbar disc displacement without myelopathy" and "right lumbar radiculitis." (AR 570.) On December 11, 2014, Plaintiff received an epidural steroid injection. According to Dr. Suryadevara's January 5, 2015 treatment notes, the injection did "not [a]ffect[] the pain much." (AR 572.) Plaintiff's daily dose of Cymbalta was increased and he was prescribed Lyrica.

On January 14, 2015, Dr. Gellis treated Plaintiff for neck pain and increased Plaintiff's daily dosage of Lyrica, and recommended a rheumatologic evaluation, but "defer[red]" on this point to Plaintiff's new primary care physician, Emily Henderson, M.D. (AR 579.) Plaintiff received an MRI on January 28, 2015, which according to Dr. Gellis showed "[m]ild cervical spondylosis" and "[m]oderate to severe left C6-C7 and moderate left C5-C6 neural foraminal stenosis." (AR 584.) Dr. Gellis considered the MRI findings to be "consistent with [Plaintiff's] symptomology." (AR 583.)

On February 2, 2015, Plaintiff visited Dr. Henderson complaining of chronic neck pain and lower back pain. Dr. Henderson recorded that Plaintiff was unable to walk heel to toe and had reduced knee vibration but otherwise had normal sensation and intact reflexes. Plaintiff reported spending over sixteen hours per day in bed due to back pain which was only improved with Vicodin and rest. He rated his neck pain at 4-5/10 with Vicodin and 9/10 without Vicodin. Plaintiff also reported having headaches for the previous six months, which occurred two times per week for hours each time. Finally, Plaintiff reported low mood, which had "worsened since he stopped working and pain has become intolerable. . . . He no longer feels enjoyment in any hobbies and feels he is getting little joy out of life." (AR 585.) Dr. Henderson prescribed Citalopram, which was later discontinued. Later in February 2015, Plaintiff received a transforaminal epidural steroid injection, but it did not provide relief.

On March 12, 2015, Dr. Huyck treated Plaintiff, who she had not seen since March 24, 2011. She characterized Plaintiff's left rotator cuff as "irreparable" and recorded that Plaintiff "reports pain in the right neck to the shoulder, into the elbows and hands, primarily over the third knuckle . . . identical to pain he is having on the left side in the left neck, into the shoulder, elbows and hands" and which he rated "from 7 to

5

10/10." (AR 610-11.) Plaintiff stated that "he can do his own self care and errands but has difficulty with household chores" and "modifies how he does things to compensate for his condition[.]" (AR 611.) Plaintiff appeared "alert and pleasant in no acute distress, although he does appear tired." (AR 612.) Following a physical exam and a review of Plaintiff's recent diagnostic studies, Dr. Huyck assessed that Plaintiff's MRI "show[ed] moderate to severe C5-6 and C6-7 neuroforaminal stenosis" and that "[c]urrent neck and arm symptoms into the third finger follow at C7 distribution consistent with his imaging." *Id.* Plaintiff also reported "generalized fatigue, weakness, achiness, and headaches." *Id.* Dr. Huyck referred him to a spine specialist and also stated she was "referring him for R[esidual] F[unctional] C[apacity] testing for his SSDI application." *Id.*

Plaintiff returned to Dr. Henderson, who noted on March 12, 2015 that Plaintiff had "applied for disability, but was rejected and is still waiting for a hearing" and that he visited Dr. Huyck, who evaluated his shoulder and "has organized a functional capacity evaluation to aid in his disability application." (AR 596.) Dr. Henderson recorded that Plaintiff had normal motor functions, normal muscle bulk and tone, and full strength in the upper and lower extremities, but decreased sensation in his right lower extremity. Dr. Henderson documented that Plaintiff complained of increasing memory loss, and of having difficulty over the past three months distinguishing dreams from reality. He also complained of constant pain with some relief from Vicodin. A spinal x-ray performed on the same day indicated "no evidence of spondylolisthesis or compression fracture" but evidenced "mild degenerative disc disease at several levels including L1-L2, L2-L3, and L3-L4." (AR 598.) Dr. Henderson opined that Plaintiff's pain was "likely secondary to peripheral neuropathy in the setting of diabetes, as well as secondary to compression of nerve roots in the setting of multiple neural foraminal stenosis[.] There is likely also a psychological component. Unfortunately the only approach that has provided some relief is the introduction of [L]yrica and [V]icodin." *Id.*

On March 23, 2015, Justin Mowchun, M.D., a neurologist at Dartmouth-Hitchcock, evaluated Plaintiff's balance complaints. Plaintiff "appear[ed] in no distress" (AR 602) and there was no evidence of ataxia, although he had an antalgic gait. Dr.

6

Mowchun's physical examination revealed multiple trigger points in Plaintiff's upper and lower extremities, most notably in his cervical paraspinal muscles. Dr. Mowchun noted that Plaintiff's pain "may be related in part to osteoarthritis; however, it is possible he could also have fibromyalgia variant." (AR 603.)

Two days later, Plaintiff sought treatment from Carey Field, M.D., a rheumatologist at Dartmouth-Hitchcock. Dr. Field recorded that Plaintiff's cranial nerves and reflexes were intact and that Plaintiff had normal strength and sensation and did not have spinal tenderness or sacroiliac joint tenderness. Dr. Field found that Plaintiff had "mild paraspinal lumbar and cervical tenderness" (AR 608) but that Plaintiff maintained close to full range of motion in his shoulders, elbows, and wrists. Dr. Field further noted that Plaintiff "has a [history] of fibromyalgia, and today his exam is consistent with this diagnosis. However, he also has some findings of what appears to be diabetic neuropathy and possibly diabetic MSK disease[.]" (AR 609.) As Dr. Henderson noted, Plaintiff's prior diagnosis of fibromyalgia was made when Plaintiff was eighteen years old. Dr. Henderson stated that she did not think it "beneficial" for Plaintiff to continue taking Vicodin and proposed physical therapy, which caused Plaintiff to become "quite upset and defensive stating that his pain was being underestimated and that by not properly treating his pain he was being forced to resort to alternative options, including purchasing on the street." (AR 630.) Dr. Henderson discouraged Plaintiff from purchasing illicit drugs to treat his pain.

On April 27, 2015, Perry Ball, M.D., a neurosurgeon at Dartmouth-Hitchcock, evaluated Plaintiff and concluded that "there is limitation of range of motion of the cervical spine in flexion and extension. Motor strength in the upper and lower extremities is full with hypoactive deep tendon reflexes. Hoffmann's sign is negative. . . . He is able to stand on his heels and toes." (AR 625.) Dr. Ball told Plaintiff that he "did not see any indications for surgery here" as Plaintiff "has no spondylolisthesis and no instability" and that his "problems [we]re overwhelmingly axial neck and low back pain" that lacked a "clear surgical target." *Id.*

7

Between May 6 and August 11, 2015, Janette L. Seville, Ph.D. engaged in cognitive behavioral therapy with Plaintiff on eight occasions, and diagnosed him with "[a]djustment disorder with depressed mood in the context of coping with chronic pain." (AR 693.) On May 6, 2015, Dr. Seville stated that Plaintiff "reports no previous treatment for his mood. The patient reports no psychiatric or rehab hospitalizations. The patient reports no history of suicide attempts or self injurious behavior (e.g. cutting). The patient states that he does not have a current counselor or psychiatrist." (AR 637-38.) Dr. Seville noted that Plaintiff had been taken off Vicodin the week before. Plaintiff reported to Dr. Seville "that his function is very low, spending 22 hours lying down each day because of pain." (AR 638.) Dr. Seville, in turn, opined that Plaintiff "would likely benefit from cognitive-behavioral therapy (CBT) focused on self management skills for pain and mood." *Id.*

On June 11, 2015, the same day as Plaintiff's FCE, Dr. Seville noted that Plaintiff "report[ed] ongoing severe pain and frustration" and that he received only two hours of sleep per night due to pain, which he rated as a "12/10." (AR 645.) On June 19, 2015, Plaintiff stated to Dr. Seville that he "felt the [FCE] went well and was satisfied with the answers he got at the meeting" and that his pain was "10/10." (AR 673.) Dr. Seville recorded on August 3, 2015 that Plaintiff "has not been practicing the relaxation or the cognitive therapy" and that Plaintiff "reports that his mood has not changed since the start of therapy." (AR 690.)

Dr. Seville completed a questionnaire for Plaintiff on August 20, 2015, noting that it was "[d]ifficult to determine if mood or pain is the limiting factor" and cited "insufficient info" in response to a series of questions regarding whether Plaintiff had a "medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support[.]" (AR 694-95.) Dr. Seville declined to complete an Assessment of Ability to Do Work-Related Activities (Mental) for Plaintiff.

### B.    Plaintiff's Function Report.

On or about April 5, 2014, Plaintiff completed a Function Report wherein he stated that his pain limited him to approximately four hours of sleep per night, "depending on pain level[.]" (AR 272.) He also reported that he had "no problem" with personal care, did not require special reminders to take care of his personal needs or to take medicine, and that he went shopping for food each week and prepared his own meals three times per day. (AR 272-73.) Plaintiff reported that he could no longer perform yard work or other outdoor activities due to his pain. His hobbies and interests included watching television, which he "mostly" did "all day if not sleeping." (AR 275.)

Plaintiff stated he could walk about 200 to 300 feet before needing to stop and rest, but had no difficulty paying attention or following written instructions and could follow spoken instructions "fairly well[.]" (AR 276.) He stated that he used a cane to assist in walking, and currently was taking Vicodin and Amitriptyline.

### C.    State Consultants' Assessments.

#### 1.    May 2014 Consultative Examination.

On May 29, 2014, State Agency Medical Consultant Fred Rossman, M.D. physically examined Plaintiff and submitted a six-page report. Dr. Rossman observed that Plaintiff appeared to be "[w]ell-developed, well-nourished" and "in no acute distress." (AR 499.) Plaintiff was able to enter Dr. Rossman's office "without antalgic or ataxic gait using no assistance such as a walker, cane, or crutches." *Id.* Plaintiff navigated the steps to enter and exit the office and did not need to shift positions during the examination.

Dr. Rossman determined that Plaintiff suffered from "[b]ilateral shoulder pain[,]" "[n]eck pain[,]" "[l]ower back pain[,]" "[n]umbness and tingling to his hands" and "[d]iabetes." (AR 501.) Plaintiff attributed his right shoulder pain to overuse, and stated that he was diagnosed with another rotator cuff tear in 2012 but did not want to undergo further surgery. Dr. Rossman noted "mild tenderness in the mid lower back" (AR 500) and stated that Plaintiff's "greatest limitation appears to be somewhat decreased lateral and forward flexion at the waist" while he also had a "decreased ability to elevate his

9

arms laterally for abduction [and was] unable to lift his arms greater than 90 degrees[.]"
(AR 501.) Dr. Rossman recorded that his neurological examination indicated Plaintiff
had "[s]ensation intact to the lower and upper extremities. Diabetic foot test intact to
sensation. Motor strength 5/5 to lower and upper extremities and foot." *Id.* Plaintiff was
able to walk heel to toe, on his toes, and on his heels.

## 2. June 2014 State Consultant's Assessment.

On June 11, 2014, State Agency Medical Consultant Francis Cook, M.D.
conducted a Medically Determinable Impairments ("MDI") analysis and physical
residual functional capacity ("RFC") assessment based on his review of Plaintiff's
medical records, Plaintiff's Function Report, and Dr. Rossman's consultative
examination. Dr. Cook noted Plaintiff's history of diabetes, left rotator-cuff tear, reports
of lower back pain, chronic neck pain, shoulder pain, and difficulty using his hands. He
acknowledged that Plaintiff's Function Report reported memory difficulties, but that "no
problems with memory" were noted by Dr. Rossman. (AR 93.) Dr. Cook identified the
following three severe impairments: "[o]steoarthrosis and [a]llied [d]isorders[,]"
"[d]iabetes [m]ellitus," and "[d]ysfunction – [m]ajor [j]oints." (AR 94.) He concluded
that "[t]he evidence does not warrant further development for a possible mental
impairment at this time." (AR 93-94.)

Dr. Cook found Plaintiff's Function Report to be only "partially credible" because
"[t]he degree of functional limitations, e.g. being able to walk only 200 to 300 feet, is not
supported by the objective evidence in the file." (AR 95.) Dr. Cook opined that Plaintiff
could lift and/or carry 25 pounds "frequently" and 50 pounds "occasionally," stand
and/or walk (with normal breaks) for "[a]bout 6 hours in an 8-hour workday" and sit
(with normal breaks) for "[a]bout 6 hours in an 8-hour workday." (AR 95.) Dr. Cook
further opined that Plaintiff could climb stairs and balance "frequently" and climb
ladders, stoop, kneel, crouch and crawl "[o]ccasionally." (AR 96.) He identified no
manipulative, visual, communicative, or environmental limitations but noted that
"[s]houlder pain and rotator cuff tear limits push/pull wit[h] upper ext[ension]." *Id.*

10

Based in part on Dr. Cook's physical RFC assessment, the SSA examiner concluded that Plaintiff demonstrated a maximum work capability for medium exertional work.

### 3. July 2014 State Consultant's Assessment.

After Plaintiff filed for reconsideration, on July 10, 2014, State Agency Medical Consultants Thomas Reilly, Ph.D. and Carl Runge, M.D. completed an MDI analysis and physical RFC assessment, respectively, based upon medical records furnished by Plaintiff.

Dr. Reilly identified the following severe impairments: "[o]steoarthrosis and allied disorders," "[d]iabetes [m]ellitus," "[d]ysfunction – [m]ajor [j]oints," "DDD ([d]isorders of [b]ack-[d]iscogenic and [d]egenerative," as well as a non-severe peripheral neuropathy impairment. (AR 116-17.) Dr. Reilly acknowledged that Plaintiff had "potential psychological conditions" but assessed that "[m]edical and subjective evidence was reviewed [which] indicates no further development of a discrete M[ental] H[ealth] impairment is needed." (AR 117.)

Dr. Runge opined that Plaintiff's statements regarding his symptoms were "partially credible," although he questioned the accuracy of Plaintiff's statement that he could only walk 200 to 300 feet. (AR 118.) Dr. Runge further opined that Plaintiff could lift and/or carry ten pounds "frequently" and twenty pounds "occasionally," stand and/or walk (with normal breaks) for "[a]bout 6 hours in an 8-hour workday," and sit (with normal breaks) for "[a]bout 6 hours in an 8-hour workday." (AR 118.) Dr. Runge found that Plaintiff could climb stairs and balance "frequently" and climb ladders, stoop, kneel, crouch, and crawl "occasionally." (AR 118-19.) He noted that Plaintiff had limited overhead reaching and handling ability, but found no visual, communicative, or environmental limitations. Dr. Runge opined that Plaintiff's "[s]houlder pain and rotator cuff tear limits push/pull with upper ext to frequent" and that Plaintiff would require five minutes of positional change for each hour spent walking, standing, or sitting. (AR 118.) Based in part on Dr. Runge's physical RFC assessment, the SSA examiner concluded that Plaintiff demonstrated a maximum work capability for light exertional work.

11

### D.     June 2015 FCE.

After resuming treatment of Plaintiff in the spring of 2015, Dr. Huyck referred
Plaintiff to Gregory Morneau, an occupational therapist at Dartmouth-Hitchcock, who
performed Plaintiff's FCE on June 11, 2015. Mr. Morneau recorded that Plaintiff could
sit for thirty-two minutes in a leaned-back position, stand for twelve minutes before
needing to sit down, walk 820 feet in six minutes, and climb twenty-four stairs holding
one rail. Plaintiff could lift between eight and twenty-three pounds at various positions.

Mr. Morneau recorded that the "[o]verall test findings, in combination with
clinical observations, suggest the presence of inconsistent levels of physical effort on
[Plaintiff's] behalf. He reported pain to be the barrier to doing more. His grip strength
testing was inconsistent with rapid grip testing being much higher than serial grip
testing." (AR 647.) Mr. Morneau nonetheless opined that the cessation of some tests due
to an "increased heart rate beyond safe level" suggested that Plaintiff had made a full
effort. *Id.* The FCE lasted sixty-two minutes.

On June 18, 2015, Ko K. Maung, M.D., an occupational and environmental
medicine resident at Dartmouth-Hitchcock, reviewed the results of the FCE with
Plaintiff. Dr. Maung stated that the results of the FCE "showed that [Plaintiff] had
impairment of sitting and standing tolerance, squatting, shoulder and back range of
motion, walking and lifting objects. . . . Frequent lifting capacity is likely much lower
than the occasional weight level listed above." (AR 652.) Dr. Maung acknowledged
"inconsistencies in effort testing" but stated that "heart rate response to exercise indicates
that results are a reasonable estimate of [Plaintiff's] current abilities for the areas tested."
*Id.*

Dr. Huyck reviewed Dr. Maung's report, and concluded that Plaintiff's "[l]ifting
capacity just meets sedentary capacity level" and that "[g]iven the level of pain and
decreased function for three days after testing, . . . it is very unlikely that [Plaintiff] would
be able to tolerate a full time (8 hour day) sedentary work position." (AR 653.) Dr.
Huyck deemed the FCE results "usable" because Plaintiff "reached a cardiovascular limit

12

with increased heart rate multiple times needing to be stopped from further activity[,] indicating full effort." *Id.*

### E. Plaintiff's Testimony at the September 16, 2015 Hearing.

Plaintiff testified that he slipped and fell on ice in 2010, tearing his left rotator cuff, which he re-tore during post-surgery rehabilitation. He stated that his right shoulder pain developed due to "[t]rying to compensate due to the injury on the left-hand side." (AR 68.) Plaintiff testified that "[d]ue to pain in my neck, shoulders, my back, . . . my knees on my right side, both my feet I have trouble walking, very little lifting, it hurts to lift. Any time I do I'm in bed. Also the all over body pain that if I do too much during the day that next day I'm in bed sleeping." (AR 63-64.) He explained that his reaching is "very limited, due to pain in my shoulders, neck" and that his shoulders have become equally painful. (AR 70.)

On a typical day, Plaintiff testified that he makes his own breakfast and sits in a reclined position until the pain forces him to return to bed. He explained that he retrieves his mail, which entails a fifty- or sixty-foot walk, and tries to move around as much as he can. On a good day, he testified that he could accomplish two or three chores. Plaintiff does his own laundry and washes his own dishes but due to his pain, he "end[s] up having to sit down in a reclining position and then eventually back in bed." (AR 64.) Laundry "will take . . . usually pretty much all day for one load." (AR 67.) Plaintiff does his own grocery shopping and is able to drive, but it bothers him to sit up in the car and use the clutch.

Plaintiff stated that he sleeps three to five hours per night and spends the majority of the day awake. He noted that he was diagnosed with "severe obstructive sleep apnea" and that he had been using a BiPAP, but that it had not ameliorated his fatigue level. (AR 72.) Plaintiff testified that he no longer takes Vicodin, but takes Lyrica, which causes foot swelling.

Plaintiff further testified that his hands shake, and that he drops things "a couple of times a week" due to swelling in his hands. (AR 74.) Following his FCE, Plaintiff stated that for "[a]pproximately three days . . . I had the feeling that I was almost coming down

13

with a grip, totally exhausted. My hands hurt severely so it was very hard for me to grip anything because they hurt." (AR 75.) Plaintiff also stated that:

> [m]y neck hurt to the point where I was having a hard time picking it up off the bed. I was in bed pretty much for a day and a half due to the pain in my back, lower legs, my feet hurt to the point where I had a hard time walking. The only time I got out of bed was to go to the bathroom or get something to eat which consisted of basically a raw hot dog, nothing that I would spend any time out of bed for.

*Id.*

Plaintiff stated that he had undergone an evaluation in Boston for his re-torn rotator cuff in 2011, but there was nothing that could be repaired. Plaintiff noted he continues to see Dr. Huyck, but was no longer seeing his counselor because he no longer had access to transportation. Plaintiff testified that his doctors "basically have told me to try to do anything more that I can do periodically through the day which I do try to do. If I'm feeling well enough I will try to do a little walk around the house, you know, I try to move around, bend." (AR 77.)

## III. ALJ Merrill's Application of the Five-Step, Sequential Evaluation Process.

In order to receive SSDI or SSI benefits, a claimant must be disabled on or before his or her date last insured. Social Security Administration ("SSA") regulations set forth the following five-step, sequential evaluation process to determine whether a claimant is disabled:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)). "The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden

14

of proving his or her case at [S]teps [O]ne through [F]our of the sequential five-step framework established in the SSA regulations[.]" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation marks and citation omitted).  At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *McIntyre*, 758 F.3d at 150 (alterations in original) (internal quotation marks omitted).

In this case, ALJ Merrill determined that Plaintiff's last date insured was December 31, 2015, and that Plaintiff had not engaged in substantial gainful activity since November 27, 2013.  At Step Two, ALJ Merrill found that Plaintiff had the following severe impairments: "degenerative disc disease of the lumbar spine, diabetes mellitus, and osteoarthritis of the shoulders[.]"  (AR 20.)  While noting that Plaintiff's medical records evidenced a diagnosis of "severe obstructive sleep apnea," ALJ Merrill concluded that "the record fails to support any specific work-related functional limitations attributable to this diagnosis" and thus determined that this condition was non-severe.  *Id.*  ALJ Merrill also found that while Plaintiff alleged symptoms of depression, "any mental health limitation [was] not medically determinable or alternatively non-severe[.]"  *Id.*  Finally, ALJ Merrill found that due to the "complete lack of treatment history" with respect to Plaintiff's complaints of anhedonia, sleep disturbance, decreased energy, and feelings of guilt or worthlessness, these conditions were non-severe or not medically determinable.  (AR 20-21.)

At Step Three, ALJ Merrill determined that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of any listed impairment. At Step Four, he concluded that Plaintiff had the residual functional capacity to "perform light work as defined as in [20 C.F.R. § 404.1567(b)] and [20 C.F.R. § 416.967(b)] except that[:]"

> he could lift and carry twenty pounds occasionally and ten pounds
> frequently; stand or walk for six hours and sit for six hours in an eight-hour
> day; frequently push or pull with his upper extremities; frequently climb
> ramps or stairs and balance, but occasionally stoop, kneel, crouch, and
> crawl; occasionally reach overhead with the bilateral upper extremities.

15

(AR 21-22.) ALJ Merrill considered all of Plaintiff's alleged symptoms and found that Plaintiff's medically determinable impairments could reasonably be expected to cause his symptoms; however, Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible. Based on Plaintiff's RFC for light work with the identified limitations, ALJ Merrill determined that Plaintiff was capable of performing his past relevant work as a real estate sales agent.

At Step Five, ALJ Merrill determined, based in part on VE Spaulding's testimony,[2] that Plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy" (AR 29), which provided additional grounds for his conclusion that Plaintiff was not disabled.

## IV.   Conclusions of Law and Analysis.

### A.   Standard of Review.

In reviewing the Commissioner's decision, the court "'conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied.'" *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

Even if the court could draw different conclusions after an independent review of the record, the court must uphold the Commissioner's decision when it is supported by substantial evidence and when the proper legal principles have been applied. *See* 42 U.S.C. § 405(g). It is the Commissioner that resolves evidentiary conflicts and determines credibility issues, and the court may not substitute its own judgment for that of the Commissioner. *See Aponte v. Sec'y, Dep't of Health & Human Servs. of U.S.*, 728

---

[2] VE Spaulding testified that in light of Plaintiff's age, education, work experience, and RFC, he could perform his prior employment as a real estate sales agent as well as occupations such as "cashier," "sales attendant," or "ticket seller." (AR 80-81.)

F.2d 588, 591 (2d Cir. 1984) ("It is the function of the [Commissioner], not the reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses.").

## B.      Whether ALJ Merrill Erred in Evaluating Plaintiff's Medical Evidence.

Plaintiff argues that ALJ Merrill made several legal errors in his evaluation of the medical evidence in the record, including incorrectly determining the "relevant time period applicable to the materiality of evidence" and not finding Plaintiff's fibromyalgia to be a "severe impairment." (Doc. 5-1 at 8.)

### 1.      Whether ALJ Merrill Erred in Determining That Certain Medical Evidence Was Immaterial.

Plaintiff contends that ALJ Merrill's conclusion that Plaintiff's medical records dated prior to November 28, 2012 were immaterial constituted legal error. In his decision, ALJ Merrill stated that "the only material evidence is 'evidence dated within 12 months of the alleged onset date'" and therefore determined that Plaintiff's medical records dated prior to November 28, 2012 are "immaterial in their entirety." (AR 17 (citing HALLEX I-2-6-58, 1993 WL 643036 (last updated Aug. 2, 2016)).)

The Hearings, Appeals and Litigation Law Manual ("HALLEX") I-2-6-58, relied upon by ALJ Merrill, provides that the ALJ "will generally admit into the record any information he or she determines is material to the issues in the case" and that "[i]nformation is material if it is relevant[.]" 1993 WL 643036. It further provides that examples of information that "may be material to a claim for disability" include: "[e]vidence dated within 12 months of the alleged onset date under a title II application for disability insurance benefits." *Id.* Plaintiff argues that "[i]t is not true that under the cited HALLEX provision 'only' evidence within 12 months of the alleged onset date are material. The manual is clear that that is just an example of evidence that is material." (Doc. 5-1 at 8.)

While the Second Circuit has not addressed the issue, district courts within this circuit, as well as other circuit courts, have held that "HALLEX is a purely internal manual and as such has no legal force and is not binding." *Moore v. Apfel*, 216 F.3d 864,

17

868 (9th Cir. 2000). *See, e.g., Edwards v. Astrue*, 2011 WL 3490024, at *6 (D. Conn. Aug. 10, 2011) (concluding that "although the Second Circuit Court of Appeals has not reached the issue, other circuits and Second Circuit district courts have found that HALLEX policies are not regulations and therefore not deserving of controlling weight"); *see also Schweiker v. Hansen*, 450 U.S. 785, 789 (1981) (holding that the SSA's Claims Manual "is not a regulation. It has no legal force, and it does not bind the SSA. Rather, it is a 13-volume handbook for internal use by thousands of SSA employees[.]"). However, some courts have concluded that the SSA "is required to follow its own internal policies when they accord with or are more demanding than the statute or its regulations." *Edwards*, 2011 WL 3490024, at *6; *see also McCoy v. Barnhart*, 309 F. Supp. 2d 1281, 1284 (D. Kan. 2004) (noting that when "the HALLEX simply restates an administrative regulation, it is enforceable"). Plaintiff does not identify any SSA regulation that accords with or is less stringent than HALLEX I-2-6-58.

While it is doubtful that an ALJ's misinterpretation of HALLEX constitutes legal error, assuming it does, Plaintiff has not explained why it warrants a remand in this case. HALLEX I-2-6-58 governs the admission of evidence into the record before the ALJ. ALJ Merrill did not refuse to admit Plaintiff's medical records dated prior to November 28, 2012. Rather, those records, most of which consist of treatment notes created in the 2010-11 time period, are part of the record. ALJ Merrill examined these records, referred to them in his decision, and ultimately concluded that they were irrelevant to Plaintiff's benefits determination because Plaintiff alleged a November 28, 2013 onset date of disability, which was well over a year later. After Plaintiff received the treatment documented in these records, he performed past relevant work as a real estate sales agent for several months in 2013. ALJ Merrill was therefore not required to consider or accord any degree of weight to treatment notes created well before the relevant time period. *See Davis v. Colvin*, 2016 WL 368009, at *1 (W.D.N.Y. Feb. 1, 2016) (determining that the "relevant time period" with respect to Plaintiff's application "began on the alleged onset date . . . and ended on the date she was last insured"). As a result, to the extent ALJ Merrill misinterpreted HALLEX I-2-6-58, any error was harmless.

18

### 2.     Whether ALJ Merrill Erred by Not Finding That Fibromyalgia Was a Severe, Medically Determinable Impairment.

Plaintiff argues that ALJ Merrill erred in omitting fibromyalgia as a medically determinable impairment to be included in Plaintiff's RFC determination, correctly noting that ALJ Merrill did not discuss fibromyalgia in his decision.  Plaintiff asserts that Dr. Field "diagnosed fibromyalgia on March 25, 2015 after another Dartmouth physician, Neurologist Justin Mowchun, M.D. thought this diagnosis was possible." (Doc. 5-1 at 9-10.)  Dr. Field's treatment notes, however, merely record that Plaintiff had a history of fibromyalgia, and that Plaintiff's examination was "consistent with [that] diagnosis." (AR 609.)  Fibromyalgia does not appear in the "Problem list" in Dr. Field's notes. (AR 608.)  Other references in the record do not clearly support Plaintiff's contention that he was diagnosed with fibromyalgia during the relevant time period.[3]  Fibromyalgia was nonetheless listed in Mr. Morneau's FCE as one of Plaintiff's five diagnoses and Dr. Huyck referred to Plaintiff's fibromyalgia as "severe" on June 18, 2015. (AR 653.)

As the Commissioner points out, SSA regulations provide that either of two sets of criteria must be satisfied in order to establish a fibromyalgia diagnosis.  The 1990 ACR Criteria for the Classification of Fibromyalgia (the "1990 Criteria") require "[a] history of widespread pain" in "all quadrants of the body . . . and axial skeletal pain . . . that has persisted (or that persisted) for at least 3 months"; at least eleven positive tender points; and evidence that "other disorders that could cause the symptoms or signs were excluded." *See* SSR 12-2p, 2012 WL 3104869, at *2 (July 25, 2012).  The 2010 ACR Preliminary Diagnostic Criteria (the "2010 Criteria") require a history of widespread pain, the exclusion of other disorders as the cause of the claimant's symptoms or signs, and "[r]epeated manifestations of six or more [fibromyalgia] symptoms, signs, or co-occurring conditions[.]" *Id.*

---

[3] Dr. Mowchun's speculation that Plaintiff "could also have fibromyalgia variant" does not constitute a diagnosis. (AR 603.)  Similarly, Dr. Henderson noted a prior fibromyalgia diagnosis Plaintiff received when he was eighteen years old, but did not render such a diagnosis herself.

While Dr. Field noted the presence of "tender points" on March 25, 2015, her treatment notes identify fewer than the eleven tender points required under the 1990 Criteria to establish a fibromyalgia diagnosis. (AR 609 (noting "cervical, lower lumbar, trapezius, bilateral epicondyles, bilateral trochanter[]" tender points).) Dr. Field also stated that Plaintiff's symptoms were consistent with diabetic neuropathy, and thus did not rule out that other disorders may have caused his fibromyalgia symptoms. Dr. Huyck stated that Plaintiff's "extreme fatigue and pain" were "consistent with SSA fibromyalgia guidelines" (AR 653), but this statement, without more, does not meet the level of specificity required by the 1990 Criteria and the 2010 Criteria. Because Plaintiff has not satisfied his burden to establish that he was diagnosed with fibromyalgia during the relevant period, ALJ Merrill did not err by omitting fibromyalgia as a severe, medically determinable impairment.

Assuming *arguendo* that Plaintiff was diagnosed with fibromyalgia, such a diagnosis, standing alone, is insufficient to establish a severe impairment under applicable regulations. *See Williams v. Bowen*, 859 F.2d 255, 259 (2d Cir. 1988) (holding that a diagnosis of a listed impairment is "not sufficient" to establish a claimant's entitlement to SSDI benefits); *Cobbins v. Comm'r of Soc. Sec.*, 32 F. Supp. 3d 126, 133 (N.D.N.Y. 2012) ("[T]he mere diagnosis of an impairment is not sufficient to establish 'severity' under step two. Plaintiff does not point to any assessment by a medical provider of limitations arising from fibromyalgia."). Plaintiff did not identify fibromyalgia as a medical condition that limited his ability to work in his Function Report or in his application for SSA benefits.[4] ALJ Merrill was therefore not required to include fibromyalgia among Plaintiff's impairments, "particularly where, as here, the Plaintiff failed to provide an assessment by a medical provider of limitations caused by fibromyalgia." *Id.*

---

[4] *See* AR 248 (listing "left ro[tat]or cuff repair and retear[,]" "left elbow nerve pinc[h]ed[,]" "c[h]ronic neck pain[,]" "lower back disc r[u]p[]ture[,]" "diabe[]tic with insulin" and "same symptoms on right side of shoulder").

Any error in ALJ Merrill's analysis of Plaintiff's fibromyalgia is moreover harmless because he proceeded with the remaining steps of the sequential process. *See Cobbins*, 32 F. Supp. 3d at 133 ("[B]ecause the ALJ concluded that Plaintiff had a severe impairment . . . and continued with the sequential analysis, any arguable inadequacy in connection with the fibromyalgia was harmless."); *see also Stanton v. Astrue*, 370 F. App'x 231, 233 n.1 (2d Cir. 2010) (holding that because the ALJ identified severe impairments at Step Two and proceeded through the sequential evaluation process, any error would not warrant remand). ALJ Merrill analyzed Plaintiff's severe and non-severe impairments and found that due to Plaintiff's pain and other impairments, Plaintiff was restricted to light work and had limited abilities to stand, walk, and perform other manipulative functions during an eight-hour day. He therefore included Plaintiff's pain, regardless of its source, in his RFC determination. *See Diakogiannis v. Astrue*, 975 F. Supp. 2d 299, 311-12 (W.D.N.Y. 2013) ("As a general matter, an error in an ALJ's severity assessment with regard to a given impairment is harmless . . . when it is clear that the ALJ considered the claimant's [impairments] and their effect on his or her ability to work during the balance of the sequential evaluation process.") (internal quotation marks omitted).

## C. Whether ALJ Merrill Properly Applied the Treating Physician Rule.

Plaintiff contends that ALJ Merrill erred in failing to accord Dr. Huyck controlling weight as a treating physician. "[T]he [Social Security Administration] recognizes a treating physician rule of deference to the views of the physician who has engaged in the primary treatment of the claimant[.]" *Burgess*, 537 F.3d at 128 (internal quotation marks omitted). Under the treating physician rule, the opinions of treating physicians are "binding if . . . supported by medical evidence and not contradicted by substantial evidence in the record." *Selian*, 708 F.3d at 418.

To weigh the opinion of a treating physician, an ALJ must consider, among other things, the length, frequency, nature, and extent of the treatment relationship; the consistency of the opinion offered with the "record as a whole"; and whether it is "of a specialist about medical issues related to his or her area of specialty[.]" 20 C.F.R.

§§ 404.1527(c)(2), (4), (5) & 416.927(c)(2), (4), (5). An ALJ is "required either to give [the opinions of a claimant's treating physician] controlling weight or to provide good reasons for discounting them." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

Dr. Huyck treated Plaintiff in 2010, 2011, and 2015. It is therefore clear that her opinions were subject to the treating physician rule.[5] Although ALJ Merrill did not explicitly designate Dr. Huyck as a treating source, the issue is not her designation but whether, guided by the factors set forth in § 404.1527(c), he provided good reasons for not according her opinions controlling weight.

In evaluating Dr. Huyck's adoption of Mr. Morneau's FCE, ALJ Merrill accurately observed that Dr. Huyck did not have "a significant, lengthy treatment history with the claimant during the period under review." (AR 27.) The record reveals that while Dr. Huyck treated Plaintiff extensively during the 2010-11 time frame, over two years before Plaintiff's alleged onset date, she did not resume treatment of him until the spring of 2015. Although Dr. Huyck may have had access to Plaintiff's prior treatment records, Dr. Huyck only met with Plaintiff for sixty minutes on March 12, 2015 and for twenty-five minutes on June 18, 2015, primarily in order to review the results of an FCE she ordered but did not perform. *See Donnelly v. Colvin*, 2015 WL 1499227, at *12 (S.D.N.Y. Mar. 31, 2015) (concluding that the claimant's "three visits with [physician] do not constitute sufficient contact to warrant [that physician's] opinion being afforded additional weight as [the claimant's] treating physician"). Thus, while Plaintiff had established a treating relationship with Dr. Huyck during the period after November 28,

---

[5] Plaintiff accurately asserts that ALJ Merrill also failed to note that Dr. Huyck is a specialist in the field of occupational medicine and is familiar with the SSDI program criteria, factors which he argues weigh in favor of according her opinions controlling weight. *See* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). However, while an ALJ must consider the § 404.1527(c) factors, the ALJ need not analyze each of the factors specifically. *See Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir. 2004) (per curiam) (upholding decision where ALJ did not mention § 404.1527(c) factors but gave "good reasons" for his decision to afford little weight to a treating physician's opinion such that "the substance of the treating physician rule was not traversed"). There is no basis for concluding that had ALJ Merrill specifically recognized Dr. Huyck's specialization and familiarity with SSDI regulations, the outcome would have been different.

2013, ALJ Merrill reasonably concluded that, for purposes of the relevant time period, the duration and extent of this treating relationship were limited. *See* 20 C.F.R. § 404.1527(c)(2)(ii) (permitting ALJ to consider "the treatment the source has provided and . . . the kinds and extent of examinations and testing the source has performed or ordered").

As an additional reason for refusing to accord her opinions controlling weight, ALJ Merrill faulted Dr. Huyck for not adequately explaining why she adopted the findings of the FCE. In her treatment notes for June 18, 2015, she acknowledged that Plaintiff "lacked consistent signs of full effort on testing" during the FCE, but nevertheless deemed the results "usable." (AR 653.) Dr. Huyck noted that she "discussed this with the OT [Mr. Morneau] and he agrees results are usable given evidence of cardiovascular effort." *Id.* Dr. Huyck's adoption of the FCE results therefore apparently depended in large measure upon the opinion of Mr. Morneau, who is not an acceptable medical source.[6] Dr. Huyck provided no further explanation for accepting the results of the FCE, other than Plaintiff's self-report that he experienced "pain and decreased function for three days after testing[.]" *Id.* ALJ Merrill found that Plaintiff's self-reports of "near bed-bound functioning" were inconsistent with Plaintiff's "generally mild findings on objective examination." (AR 27.) This conclusion was supported by substantial evidence in the record. ALJ Merrill thus adequately explained the basis for his conclusion that Dr. Huyck's adoption of the FCE was not supported by the record as a whole. *See* 20 C.F.R. §§ 404.1527(c)(3)-(4) (providing that "[t]he better an explanation a source provides for an opinion, the more weight [the SSA] will give that opinion" and that "the more consistent an opinion is with the record as a whole, the more weight [the SSA] will give to that opinion").

---

[6] As ALJ Merrill noted, an occupational therapist is not an acceptable medical source. *See* 20 C.F.R. § 404.1513(a). Therapists are considered "other sources." *See id.* § 404.1513(d)(1). Information from "'other sources' cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an 'acceptable medical source' for this purpose." SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Finally, ALJ Merrill also properly recognized that Dr. Huyck's limited treatment of Plaintiff in 2015 was almost solely for advocacy-related purposes. Indeed, Dr. Huyck provided no specific treatment to Plaintiff but instead merely supported his disability application. ALJ Merrill did not err in concluding this affected the credibility of Dr. Huyck's opinions. *See Miller v. Comm'r of Soc. Sec.*, 2015 WL 1383816, at \*4 (N.D.N.Y. Mar. 25, 2015) (holding that a treating source opinion that "appears overly sympathetic such that objective impartiality is doubtful and goal-oriented advocacy is reasonably suspected, can be rejected").

Because ALJ Merrill provided "good reasons" for affording Dr. Huyck's opinions no weight, including her limited treatment relationship with Plaintiff, her reliance on Mr. Morneau's inconsistent findings, and the advocacy-related basis for the resumed treatment relationship, remand is not warranted. While ALJ Merrill could have provided a more detailed analysis under § 404.1527(c), "the substance of the treating physician rule was not traversed." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam).

**D.** **Whether ALJ Merrill Erred in According the FCE No Weight.**

Plaintiff claims that in analyzing Mr. Morneau's FCE, as adopted by Dr. Huyck, ALJ Merrill made an impermissible credibility determination by arbitrarily substituting his judgment for the opinions of Plaintiff's medical providers. *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (holding that "'the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion'"). In according the FCE no weight, ALJ Merrill cited Mr. Morneau's statement "not[ing] inconsistent effort on the claimant's behalf with regard to his functioning on grip strength vs rapid grip testing, which somewhat colors the findings of the evaluation[.]" (AR 27.) He acknowledged that Mr. Morneau also noted that Plaintiff's "heart rate was high[,] suggestive of good effort" but nevertheless concluded that Plaintiff's inconsistent grip effort "does call into question the credibility of the findings." *Id.* In this manner, ALJ Merrill properly resolved an evidentiary conflict regarding Plaintiff's effort level during the FCE. *See Cole v. Colvin*, 2015 WL 1393160, at \*16 (W.D.N.Y. Mar. 25, 2015) (holding that the ALJ provided

"specific reasons . . . for his finding of credibility" and thus "ably resolved the evidentiary conflicts and reasonably appraised the credibility of the witnesses"); *see also Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (concluding that the ALJ "was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole").

Although this court might reach a different conclusion, ALJ Merrill's determination that the FCE was not reliable was within his discretion, and was supported by substantial evidence in the record. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve."); *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998) ("It is for the SSA, and not this court, to weigh the conflicting evidence in the record.").

### E.    Whether ALJ Merrill Erred in According Significant Weight to Dr. Runge's Opinions.

Plaintiff asserts that ALJ Merrill erred in according significant weight to the opinions of non-examining medical consultant Dr. Runge.  The Commissioner responds that Dr. Runge's opinions were supported by evidence in the record and, indeed, were more consistent with the totality of the record than Dr. Huyck's opinions.

"In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources."  SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996).  Provided that the non-examining sources' opinions "are supported by evidence in the record[,]" the ALJ may "permit the opinions of non[-]examining sources to override treating sources' opinions[.]"  *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) (citing *Schisler v. Sullivan*, 3 F.3d 563, 567-68 (2d Cir. 1993)); *see also Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983) ("[T]he opinion of a treating physician is not binding if it is contradicted by substantial evidence, and the report of a consultative physician may constitute such evidence.") (citation omitted).

While acknowledging that Dr. Runge never personally examined Plaintiff, ALJ Merrill recognized that Dr. Runge was an agency consultant familiar with federal

25

disability standards,[7] that Dr. Runge reviewed a substantial portion of Plaintiff's medical records, and that Dr. Runge's opinion that Plaintiff has the physical ability to perform light work was consistent with other evidence in the record, including Plaintiff's testimony that he has the ability to care for his personal needs, perform a range of household tasks, drive, and perform errands, all of which ALJ Merrill noted in his decision. Although Dr. Runge did not consider evidence submitted after his July 2014 assessment, ALJ Merrill accurately observed that subsequent medical evidence in the record did not "support substantial erosion in [Plaintiff's] function or a finding of disability." (AR 26.) As a result, ALJ Merrill's conclusion that Dr. Runge's assessment is "supported by the record, when considered as a whole, and especially in light of the lack of objective testing or scans that support the claimant's debilitating pain as described" (AR 27) was not in error. *See Charbonneau v. Astrue*, 2012 WL 287561, at *7 (D. Vt. Jan. 31, 2012) (affirming ALJ's decision to accord great weight to non-examining medical consultant where there was no subsequent "evidence of a new diagnosis or worsening of [plaintiff's] condition").

## F.    Whether ALJ Merrill Erred in Finding Plaintiff's Clinical Presentation Was Consistently Mild and Further Limitations in His RFC Were Not Warranted.

Plaintiff disputes ALJ Merrill's finding that "[t]hroughout the period under review, the claimant's objective clinical presentation is consistently quite mild and fails to support any limitations beyond those cited in the residual functional capacity[.]" (AR 25.) In support of this conclusion, ALJ Merrill cited Dr. Rossman's May 2014 consultative examination, which noted that Plaintiff presented in no acute distress, possessed a normal gait, and was able to perform a wide range of ambulatory movements. Dr. Haq, who treated Plaintiff in June 2014, similarly noted that Plaintiff did not appear to be in acute distress and had a normal gait and normal motor functions. ALJ Merrill

---

[7] Applicable regulations authorize an ALJ's reliance on state agency medical consultants in appropriate circumstances. *See* 20 C.F.R. § 404.1527(e)(2) ("When an [ALJ] considers findings of a State agency medical or psychological consultant . . ., the [ALJ] will evaluate the findings using the relevant factors . . . such as the consultant's medical specialty and expertise in our rules [and] the supporting evidence in the case record[.]").

also cited Dr. Gellis's December 2014 treatment notes recording that Plaintiff had normal muscle strength, normal sensation, lumbar tenderness, and normal heel and toe walk and that Plaintiff exhibited a similar state in visits to treating physicians in February, March, and July of 2015. ALJ Merrill concluded that "[w]hile this objective clinical presentation does show some objective deficits, it fails to support the claimant's allegations of debilitating pain necessitating that he be nearly bed-bound." (AR 26.) As ALJ Merrill adequately explained the factors he considered and specific treatment notes he relied on, his conclusions are supported by more than "a mere scintilla" of evidence. *See Selian*, 708 F.3d at 417.

Similarly, although Plaintiff challenges ALJ Merrill's failure to carefully analyze his back and neck pain and re-torn rotator cuff, ALJ Merrill noted that Dr. Ball, a neurosurgeon, did not "see any clear surgical target" and "did not see any indications for surgery" in light of Plaintiff's lack of spondylolisthesis and instability (AR 24; AR 625), and that Plaintiff's March 2014 MRI revealed only "[i]nconsequential disc protrusion" and which was "otherwise unremarkable." (AR 662.) Conflicting evidence in the record such as Plaintiff's January 28, 2015 MRI which revealed "[m]oderate to severe left C6-C7 and moderate left C5-C6 neural foraminal stenosis" (AR 584) exists but does not negate ALJ Merrill's finding that Plaintiff's clinical presentation was "consistently quite mild." (AR 25.) Other than his FCE, none of Plaintiff's treatment records reveal significant limitations upon clinical examination. *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) ("Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence.") (internal quotation marks omitted). Where, as here, there is substantial evidence in the record to support ALJ Merrill's findings, the court cannot substitute its judgment for the ALJ's, even if it might have reasonably reached a different conclusion. *See Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner.").

27

## CONCLUSION

For the foregoing reasons, the court DENIES Plaintiff's motion for an Order reversing the Commissioner's decision (Doc. 5) and GRANTS the Commissioner's motion to affirm (Doc. 6).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this ___8___ day of March, 2017.

Christina Reiss, Chief Judge
United States District Court